IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Montavis Kentrail Gaines, #323168, | ) | C/A No. 5:14-04652-JMC-KDW |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| | ) | |
| Warden Richard Cothram, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Petitioner Montavis Kentrail Gaines ("Petitioner") is a state prisoner who filed this pro se petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  This matter is before the court pursuant to 28 U.S.C. § 636(b)(1)(B), and Local Civil Rule 73.02(B)(2)(c) DSC, for a Report and Recommendation on Petitioner's Motion for Default Judgment, ECF No. 20, and Respondent's Return and Motion for Summary Judgment, ECF Nos. 21, 22. On March 31, 2015, pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), the court advised Petitioner of the Summary Judgment Motion, dismissal procedures, and the possible consequences if he failed to respond adequately to Respondent's Motion. ECF No. 24.  On July 2, 2015, Petitioner filed a Response in Opposition to Respondent's Motion for Summary Judgment after receiving a 60-day filing extension. ECF No. 37. Having carefully considered the parties' submissions and the record in this case, the undersigned recommends that Respondent's Motion for Summary Judgment, ECF No. 22, be granted, and Petitioner's Motion for Default Judgment, ECF No. 20, be denied.

I.    Background

Petitioner is currently incarcerated in the Turbeville Correctional Institution of the South Carolina Department of Corrections ("SCDC"). ECF No. 1 at 1. In 2006, Petitioner was indicted at the November term of the Saluda County Grand Jury for armed robbery (2006-GS-41-419), criminal conspiracy (2006-GS-41-420), and assault and battery with intent to kill (2006-GS-41-421). App. 311-16.[1] Attorney Michael Ray Ellisor represented Petitioner in a jury trial that convened from July 24-26, 2007, and Assistant Solicitors H. Franklin Young and Ervin J. Maye represented the State. App. 1. Petitioner was tried before the Honorable William P. Keesley. *Id.* After the trial, the jury found Petitioner guilty of armed robbery, criminal conspiracy, and the lesser-included offense of assault and battery of a high and aggravated nature ("ABHAN"). App. 208. Judge Keesley sentenced Petitioner to twenty-years imprisonment for the armed robbery conviction, five-years imprisonment for the criminal conspiracy conviction, and ten-years imprisonment for the ABHAN conviction. App. 209. The trial court ordered that the sentences run concurrent. App. 209.

Appellate Defender Katherine H. Hudgins represented Petitioner on direct appeal and filed an *Anders*[2] Brief on his behalf on July 21, 2008. ECF No. 21-3. In his *Anders* brief, Petitioner presented the following issue on appeal: "Did the judge err in allowing a police officer to testify that he recognized an individual in the videotape of a robbery as the appellant, Montavious [sic] Gaines, because the officer had contact with Gaines in the past?" *Id.* at 6, 8. In a pro se brief, Petitioner raised the following issues: "Did the trial court err in allowing the Solicitor to exercise a peremptory challenge in a discriminatory manner?" and "Did the trial court abuse its discretion in admitting identification testimony that was suggesting in nature and

---

[1] Citations to "App." refer to the Petitioner's trial transcript, appeal from his sentence and conviction, and his claim for collateral relief in the state courts of South Carolina. That appendix is available at ECF Nos. 21-1 and 21-2 in this habeas matter.
[2] *See Anders v. California*, 386 U.S. 738 (1967).

2

defective under Neil v. Bigers [sic]?" ECF No. 21-7 at 4-11. Additionally, Petitioner filed an amendment to his pro se brief and raised the following issue: "the trial court erred by failing to conduct a suppression hearing regarding the reliability of subjects allege show—identification that subject was never identified by the victim of the allege robbery-see transcript pages." ECF No. 21-8. The South Carolina Court of Appeals affirmed Petitioner's conviction and sentence in an unpublished opinion filed October 2, 2009. ECF No. 21-3 at 15-16. On October 21, 2009, the Court of Appeals issued a Remittitur. ECF No. 21-9.

II.    Procedural History

Petitioner filed an application for Post-Conviction Relief ("PCR") on November 6, 2009, (2009-CP-41-176), and asserted a general claim for "Ineffective Assistance of Trial Counsel." App. 212-17. Assistant Attorney General A. West Lee filed a Return on behalf of the State. App. 218-21. Subsequently, Richard G. Gleissner, Esquire, ("Attorney Gleissner") filed an Amended Application for PCR on Petitioner's behalf on March 16, 2010. App. 223-228. There, Petitioner expanded upon his general claim for ineffective-assistance-of-counsel and argued that trial counsel was ineffective because "he failed to discovery (sic) and disclose to the court and the jury an agreement between the State of South Carolina and [Jerome] Rhoads [the individual who allegedly conspired with Petitioner] in which Rhoads was to receive favorable treatment in exchange for his testimony against [Petitioner]." *Id.* at 223. Additionally, Petitioner argued that "the prosecution committed misconduct in failing to disclose the agreement between the prosecution and Rhoads for his testimony." *Id.* at 223-24.

A PCR hearing convened on January 31, 2012, before the Honorable Eugene C. Griffith, Jr. App. 236-289. Petitioner was present and represented by Attorney Gleissner and Assistant Attorney General Kaelon E. May appeared on behalf of the State. *Id.* Jerome Rhoads, Petitioner,

Assistant Solicitor Young, and Assistant Solicitor Maye testified during the PCR hearing. *Id.* In

an Order filed April 11, 2012, the PCR court denied Petitioner's PCR Application in full, making

the following findings of fact and conclusions of law:

> This Court has reviewed the testimony presented at the evidentiary hearing, observed the witnesses presented at the hearing, passed upon their credibility, and weighed the testimony accordingly. Further, this Court reviewed the Clerk of Court records regarding the subject convictions, the Applicant's records from the South Carolina Department of Corrections, the application for post-conviction relief, the transcripts and documents from the prior proceedings, the exhibits introduced into evidence at the hearing, and legal arguments of counsel. Pursuant to S.C. Code Ann. §17-27-80 (2003), this Court makes the following findings of fact based upon all of the probative evidence presented.

> **1. Ineffective Assistance of Counsel**

> At the PCR hearing Applicant withdrew his claim that counsel was ineffective for failing to object to the officer's testimony that he recognized Applicant by the way Applicant walked because of the officer's previous encounters with Applicant. The Applicant withdrew this claim based on the South Carolina Court of Appeals ruling in State v. Fripp, Op. No. 4928 (filed January 18, 2012). This Court finds that Applicant affirmatively waived said allegations set forth in his application at the PCR hearing. A waiver is a voluntary and intentional abandonment or relinquishment of a known right. Janasik v. Fairway Oaks Villas Horizontal Property Regime, 307 S.C. 339, 415 S.E.2d 384 (1992). Therefore, this allegation is denied and dismissed.

> Applicant asserts that counsel was ineffective for failing to discover and disclose to the court and the jury an agreement between the state and Jerome Rhoads in which Rhoads was to receive favorable treatment in exchange for his testimony against Applicant. The record reflects that Mr. Rhoads testified at Applicant's trial that law enforcement did not make a deal with him and that Mr. Rhoads did not have any deal at that time. At the PCR hearing Mr. Rhoads testified consistent with his trial testimony that he did not have a deal with law enforcement or the solicitor's office in which he was to receive favorable treatment in exchange for his testimony against Applicant. Additionally, assistant solicitor Ervin Maye testified that he did not engage in any plea negotiations with Jerome Rhoads prior to or during Applicant's trial. Solicitor Maye testified that it is not unusual for a co-defendant, who testifies at trial, to later receive a lesser sentence. Solicitor Young testified that he did not make any offers or deals for Mr. Rhoads's testimony against Applicant with Mr. Rhoads prior to or during Applicant's trial. Solicitor Young testified that he has never in his tenure as a solicitor offered a deal to anyone prior [to] that person testifying at trial. This Court finds that Applicant has failed to present any evidence or offer any testimony supporting

4

Applicant's allegation that the state had a deal in place with Mr. Rhoads for his testimony against Applicant prior to or during Applicant's trial. The Court finds that Applicant has failed to show that counsel's performance was deficient. Even, if this Court found counsel's performance deficient, Applicant cannot prove resulting prejudice as there is no evidence that Mr. Rhoads was given a deal by the state prior to or during Applicant's trial in exchange for his testimony. This Court finds that no deal between Mr. Rhoads and the state existed and that counsel cannot be held ineffective for failing to disclose and/or discover a deal that did not exist; therefore Applicant's allegations based on counsel's failure to discover a deal between the state and Mr. Rhoads are denied and dismissed.

Applicant asserts that counsel was ineffective for failing to object to the solicitor's closing statement. Specifically, Applicant directs this Court's attention to the statement that "Jerome Rhoads is gonna have to face his music and it's coming. Today Montavis Gaines is facing his music. We played his song." (Tr. p. 193, lines 3-4). The Applicant also directs this Court's attention to the statement that "Jerome Rhoads is a thug, Pure and simple. The man …I don't have a problem with Mr. Ellisor calling him a career criminal. That's what he is." (Tr. p. 192, lines 7-13). The solicitor's closing arguments must be viewed in the context of the entire record. McLaughlin v. State, 352 S.C. 476, 575 S.E.2d 841 (2003). While the State's closing arguments must be confined to evidence in the record and the reasonable inferences that may be drawn from the evidence, State v. Copeland, 321 S.C. 318, 468 S.E. 2d 620 (1996); to be entitled to a new trial for improper closing arguments Applicant must show "the Solicitor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." State v. Hamilton, 344 S.C. 344, 362, 543 S.E.2d 586, 596 (2001).

After reviewing the entire record, this Court does not find that any comments or questions by the solicitor so infected the trial that a new trial is warranted. This Court is not convinced that the solicitor's arguments even reach the level of being improper but certainly there is no evidence that Applicant was prejudiced. Additionally, this Court does not find that trial counsel was ineffective for failing to object. The record reflects that Mr. Rhoads was incarcerated for four (4) years for his participation in the crimes. Additionally, this Court finds that counsel failed to object to the solicitor's reference to Mr. Rhoads being a "thug;" however, the solicitor was disparaging his own witness. The Applicant has failed to set forth any basis on which to base an objection to the solicitor's comment and that such an objection would have been successful. This Court finds that Applicant has failed to show that counsel's performance was deficient and any resulting prejudice. Therefore, this allegation is denied and dismissed.

Applicant asserts that counsel was ineffective in failing to admit a prior inconsistent statement made by Ms. Bonham, a witness who testified at Applicant's trial. Applicant directs this Court's attention to Ms. Bonham's testimony on pages 120-124 of the trial transcript. Applicant assets there is a discrepancy as to when Ms. Bonham stated that she saw the Applicant and his co-

defendant try on the masks. This Court finds that Ms. Bonham's statement and testimony as to when she saw Applicant and his co-defendant trying on the masks, whether it was Saturday or the date before the robbery, does not directly attack the issue of whether she saw the defendants trying on masks. This Court finds that Applicant has failed to show that counsel's performance was deficient and any resulting prejudice; therefore, this allegation is denied and dismissed.

Applicant asserts that counsel was ineffective for failing to ask for a curative instruction after the officer's testimony alluded to prior bad acts of the Applicant. Applicant asserts that counsel failed to object to the officer's inference of prior bad acts of the Applicant. Specifically, Applicant directs this Court's attention to Lieutenant Turner's testimony, that "I've seen him around town. I've had contact with him in the past." (Tr. p.06, lines 14-16). This Court finds and the record reflects that the officer's testimony does not contain a single reference to any prior bad acts by the Applicant. Additionally, the record reflects that the court cautioned the [**illegible**] about the officer's in-camera testimony about numerous dealings with the Applicant in the past. (Tr. p.101, lines 21-24). This Court finds that while counsel did not object to the officer's testimony based on testimony of prior bad acts, such an objection would likely have been overruled as there was no testimony of prior bad acts of the Applicant. This Court finds that Applicant failed to show counsel's performance was deficient and any resulting prejudice: therefore this allegation is denied and dismissed.

## 2. Prosecutorial Misconduct

Applicant asserts that the state committed prosecutorial misconduct in failing to disclose the agreement between the prosecution and Mr. Rhoads for testimony at Applicant's trial. It is Applicant's burden to prove actual prosecutorial misconduct. Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2001 (1989). This Court has already found that no such deal or offer existed between the state and Mr. Rhoads prior to or during Applicant's trial. This Court finds that Applicant has failed to meet his burden in proving actual prosecutorial misconduct: therefore, this allegation is denied and dismissed.

Applicant asserts that the solicitor committed prosecutorial misconduct in closing argument by giving the jury the impression that no leniency would be given to Rhoads, that no agreement had been provided to Rhoads, and that Rhoads would receive a harsher sentence than Applicant. The State's closing arguments must be confined to evidence in the record and the reasonable inferences that may be drawn from the evidence. State v. Copeland, 321 S.C. 318, 468 S.E.2d 620 (1996). Furthermore, the solicitor's closing argument must not appeal to the personal biases of the jurors. Id. To be entitled to a new trial for improper closing arguments, the test is whether "the Solicitor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." State v. Hamilton. 344 S.C. 344, 362, 543 S.E.2d 586, 596 (2001). After reviewing the entire record, this Court does not find that any comments or questions by the

solicitor so infected the trial that a new trial is warranted. This Court is not convinced that the solicitor's arguments even reach the level of being improper, but certainly there is no evidence that Applicant was prejudiced. Therefore, this allegation is denied and dismissed.

**All Other Claims**

Except as discussed above, this Court finds that the Applicant affirmatively waived the remaining allegations set forth in his application at the hearing. A waiver is a voluntary and intentional abandonment or relinquishment of a known right. Janasik v. Fairway Oaks Villas Horizontal Property Regime, 307 S.C. 339, 415 S.E. 2d 384 (1992). A waiver may be express or implied. "An implied waiver results from acts and conduct of the party against whom the doctrine is invoked from which an intentional relinquishment of a right is reasonably inferable." Lyles v. BMI, Inc., 292 S.C. 153, 158-59, 355 S.E.2d 282 (Ct. App. 1987). The Applicant's failure to address these issues at the hearing indicates a voluntary and intentional relinquishment of his right to do so. Therefore, any and all remaining allegations are denied and dismissed.

**V. CONCLUSION**

Based on all the foregoing, this Court finds and concludes that the Applicant has not established any constitutional violations or deprivations that would require this Court to grant his application for post conviction relief. Therefore, this application for post conviction relief must be denied and dismissed with prejudice.

This Court notes the Applicant must file and serve notice of intent to appeal within thirty (30) days from receipt of this Order to secure the appropriate appellate review. See Rule 203, SCACR. Rule 71.1(g). SCRCP: Bray v. State, 336 S.C. 137, 620 S.E.2d 743 (2005), for the obligation of Applicant's counsel to file and serve notice of appeal. The Applicant's attention is also directed to South Carolina Appellate Court Rule 243 for process and procedures after notice has been timely filed.

**IT IS THEREFORE ORDERED**:

1. That the Application for Post-Conviction Relief must be denied and dismissed with prejudice; and
2. Applicant must be remanded to the custody of Respondent.

App. 292-305. On April 24, 2012, Attorney Gleissner filed a Motion to Reconsider pursuant to

Rule 59 SCRCP, on Petitioner's behalf, App. 306-310, and on May 24, 2012, Petitioner's Motion

was denied. ECF No. 21-3 at 17. On June 6, 2012, Attorney Gleissner filed a Notice of Appeal

on Petitioner's behalf. ECF No. 21-11. Thereafter Deputy Chief Appellate Defender Wanda H. Carter filed a Petition for Writ of Certiorari on Petitioner's behalf, dated February 19, 2013. ECF No. 21-12. Therein, he presented the following issue for review: "Trial counsel erred in failing to object to portions of the police officers' identification testimony that included references to their familiarity with petitioner based on past encounters with him because this constituted prejudicial prior bad act evidence that should not have been admitted into evidence at trial." *Id.* at 3; 5. The State filed a Return to the Petition for Writ of Certiorari on July 8, 2013. ECF No. 21-13. After the case was transferred, the South Carolina Court of Appeals denied the petition on December 3, 2014, and issued the Remittitur on January 5, 2015. ECF Nos. 21-15, 21-16.

Prior to exhausting his state remedies in his initial PCR, Petitioner filed a second PCR action on January 16, 2013. *See* ECF No. 21-17. There, Petitioner asserted the following issues: "Prosecutorial Misconduct; Brady's violation" and "Ineffective Assistance of Counsel." *Id.* at 3. In Response, the State filed a Return and a Motion to Dismiss on October 7, 2013. ECF No. 21-18. On February 6, 2014 Chief Administrative Judge Thomas A. Russo filed a Conditional Order of Dismissal finding that Petitioner's second PCR action was successive to his prior application and must be summarily dismissed. ECF No. 21-19. Additionally, the second PCR court found the second application was untimely. *Id.* at 3-4. After Petitioner was served with the Conditional Order of Dismissal, ECF No. 21-20, he filed an "Objection to response to consider conditional order of dismissal." ECF No. 21-21. There, Petitioner argued that the State failed to provide certain information to Petitioner during his first PCR action. *Id.* at 3. Further, Petitioner represented that he obtained new information after submitting a Freedom of Information Act ("FOIA") request to the Saluda County's Sheriff's Office. *Id.* at 5. Petitioner attached a Saluda Police Incident Report ("Incident Report") dated December 4, 2006, indicating that Officer

Turner[3] interviewed Jerome Rhoads who was "willing to testify for leniency from the State." *Id.*

at 9. Additionally, the Incident Report indicated: "In reference to subject, I spoke to the

Solicitor's Office on his behalf for a lighter sentence in exchange for subject's testimony." *Id.*

The second PCR court filed a Final Order of Dismissal, over Petitioner's objection, on

September 12, 2014. ECF No. 21-22. In the Conclusion of Law portion of the Order, the court

held:

> This court finds Applicant has failed to establish a prima facie newly discovered
> evidence allegation to overcome the procedural bars regarding successive and
> untimely PCR actions. Applicant has failed to plead facts that asserted his original
> trial counsel was not in possession of Officer Turner's December 2006 incident
> report. This Court finds Applicant has pled facts concerning ineffective assistance
> of PCR counsel; not newly discovered evidence. This Court finds that the factual
> matter at issue was extensively litigated in his prior PCR action and is further
> procedurally barred by the doctrine of res judicata: Applicant's co-defendant and
> both prosecuting solicitors offered testimony. This Court is compelled to follow
> the South Carolina Supreme Court's controlling precedent in <u>Kelly v. State</u> that
> dictates that allegations of ineffective assistance of PCR counsel allegations are
> incognizable in subsequent PCR applications. <u>See</u> <u>Kelly v. State</u>, 404 S.C. 365,
> 745 S.E.2d 377 (2013). Simply, this Court notes that the scope and manner in
> which PCR counsel investigated and presented Applicant's 2010 PCR case not
> warrant an exception to the procedural bars concerning successive and untimely
> PCR applications.

*Id.* at 2. On September 18, 2014, Petitioner filed a Notice of Appeal. ECF No. 21-23.

Additionally, Petitioner filed a "Motion to Consolidate Pursuant to Rule 214 S.C.A.C.R.," ECF

No. 21-24, and a document entitled "Petitioner explanation per SCACR 243 (c) pro se brief,"

ECF No. 21-25. On October 23, 2014, the South Carolina Supreme Court dismissed Petitioner's

PCR appeal pursuant to Rule 243(c) of the South Carolina Appellate Court Rules, ECF No. 21-

26, and the remittitur was issued on November 10, 2014, ECF No. 21-27.

---

[3] Officer Turner would later testify at Petitioner's trial. *See* App. 105.

While Petitioner's second PCR action was pending, he filed a Motion for Leave to File Rule 60(b) Motion with the South Carolina Supreme Court.[4] In the Rule 60(b) Motion, dated September 16, 2013, Appellate Defender Wanda Carter and PCR counsel Richard Gleissner requested that the South Carolina Supreme Court "set aside the [PCR] Order of Dismissal, filed April 11, 2012 [and] allow [Petitioner] a new trial with the inclusion of the evidence that was previously hidden from him." *Id.* at 3. In the Memorandum in Support of the Rule 60(b) Motion, Attorney Gleissner represents that Petitioner asked him to review certain materials in preparation for his second PCR hearing. *Id.* at 8. In Petitioner's communication to Attorney Gleissner, he included an Incident Report dated December 4, 2006, that was referenced in his "Objection to response to consider conditional order of dismissal." ECF No. 21-21. Attorney Gleissner represents that the Incident Report was not included in the discovery responses from the State during Petitioner's PCR matter. *Id.* Furthermore, Attorney Gleissner argues:

> This Incident Report should have been turned over to Counsel for Gaines prior to the trial so that Counsel for Gaines could have used this Incident Report in the cross examination of Rhoads and in the cross examination of the arresting officer. No such cross examination occurred and one can only assume that trial counsel was never provided with the incident report.

*Id.* at 8-9. On November 7, 2013, the South Carolina Supreme Court denied Petitioner's Motion and simply held: "Petitioner has filed a motion for leave to file a Rule 60(b), SCRCP, motion in the circuit court. The Motion is denied." ECF No. 21-25. In a footnote, the Supreme Court

---

[4] The undersigned is familiar with the Rule 60(b) Motion based on an April 28, 2015 Motion for an extension Petitioner filed in this habeas matter seeking additional time to file a response to the Motion for Summary Judgment. Petitioner included as an attachment to his Motion a document entitled "Special Notice of Exhaustion of Issues for Good Cause Shown." *See* ECF No. 33-1. In the Special Notice, Petitioner raises arguments concerning the exhaustion of certain habeas claims, and in support of his argument, Petitioner includes as an exhibit a "Motion for leave to file motion under Rule 60(b) of the South Carolina Rules of Civil Procedure." ECF No. 33-2. Though Petitioner discussed the Rule 60(b) Motion in ECF No. 21-21 and attached the Incident Report there, because leave to file the Motion was denied, the Rule 60(b) Motion and Attorney Gleissner's affidavit are not otherwise part of Respondent's Appendix.

indicated: "This ruling has no impact on petitioner's second application for post-conviction relief currently pending in the circuit court." *Id.* As noted above, Petitioner's second PCR was dismissed on September 12, 2014, the Supreme Court dismissed the appeal on October 23, 2014, and the Remittitur was issued on November 10, 2014. ECF Nos. 21-22, 21-26, 21-27. Petitioner filed this habeas Petition on December 10, 2014. ECF No. 1.

III.    Discussion

A.  Federal Habeas Issues

Petitioner raises the following four issues in his Federal Petition for a Writ of Habeas Corpus, quoted verbatim:

> GROUND ONE: The State, and its agents, along with State's witness Rhoads conspired to deny Petitioner his constitutional right to due process, by denying him a fair and impartial trial.
> Supporting Facts: During trial, Mr. Rhoads offered the most damning and prejudicial testimony against the Petitioner. All parties failed to disclose, which was mandatory or ministerial, the exculpatory evidence that a deal had, in fact, been made with Mr. Rhoads for leniency, in exchange for his testimony. This deal showed motive/incentive for Mr. Rhoads to identify Petitioner Gaines as his alleged co-defendant. This knowledge could have been used to impeach Mr. Rhoad's testimony. This was a blatant Brady violation. Concealing it, also showed bad faith and ill will by police officers during their trial testimony. Showing it was not just cumulative. ECF No. 1 at 4.
>
> GROUND TWO: The two prosecuting attornies, knowingly, gave perjured testimony, and conspired to deny "any existence of a deal," when questioned.
> Supporting Facts: At first P.C.R. evidentiary hearing, First Assist. Solicitor [Maye] testified denying the existence of having made a deal through police officers, for Rhoads, and then Second Assist. Solicitor Young testifies that it would be in writing if a deal had been made. Later through F.O.I. Act an incident report was discovered that does, in fact, document a deal being made through Officer Turner, with the Solicitor's Office, in exchange Rhoads would receive leniency for his testimony identifying Petitioner. *Id.* at 5-6.
>
> GROUND THREE: (Trial) counsel ineffective for failing to object to officer's testimony identifying Petitioner, by the way he walked, from a previous encounter.

11

Supporting Facts:  Officers testified that they recognized Petitioner, from previous encounters around the community, by the way he walked and ran. This evidence/testimony was of prior "bad acts," that prejudiced Petitioner, in that, this testimony inferred that, acting as police officers, the encounters were of a criminal nature, within the Petitioner being the suspect. This was not evidence of a conviction, nor was it clear and convincing, as it left the jury to speculate. Counsel did not object. *Id.* at 7.

GROUND FOUR:  Trial counsel ineffective for failing to discover (Sweet Heart) leniency plea agreement between Rhoads and State, and use to impeach Rhoads. Supporting Facts: See Ex. B, "Incident Report." This document discloses an agreement between Mr. Rhoads, state's witness and "alleged" co-defendant, for leniency in exchange for his testimony. This evidence showed Mr. Rhoads had motive/incentive (deal) for identifying Petitioner Gaines, as Rhoads "alleged" codefendant. This evidence could have been used to impeach Mr. Rhoads's during his testimony. Concealing it, also showed bad faith and ill will by officers during their trial testimony. Counsel's failure to investigate/discover this, was prejudicial, making him ineffective. *Id.* at 8-9.

B.  Standard for Summary Judgment

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party.  *See*

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248. Further, while the federal court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, *see, e.g., Cruz v. Beto*, 405 U.S. 319 (1972), the requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts that set forth a federal claim, nor can the court assume the existence of a genuine issue of material fact when none exists. *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990).

C.  Habeas Corpus Standard of Review

1.    Generally

Because Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), review of his claims is governed by 28 U.S.C. § 2254(d), as amended. *Lindh v. Murphy*, 521 U.S. 320, 336 (1997); *Breard v. Pruett*, 134 F.3d 615, 618 (4th Cir. 1998). Under the AEDPA, federal courts may not grant habeas corpus relief unless the underlying state adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d)(1)(2); *see Williams v. Taylor*, 529 U.S. 362,  (2000). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

13

a. Deference to State Court Decisions

Courts afford deference to state courts' resolutions of the habeas claims of state prisoners. *See Bell v. Cone*, 543 U.S. 447, 455 (2005). Recently, the Supreme Court provided further guidance regarding the deference due to state-court decisions. *Harrington v. Richter*, 562 U.S. 86 (2011); *Cullen v. Pinholster*, 131 S. Ct. 1388 (2011). To obtain habeas relief from a federal court, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." 562 U.S. at 102. In *Harrington*, the Court further stated: "If this standard is difficult to meet, that is because it was meant to be." *Id.*; *see Richardson v. Branker*, 668 F.3d 128, 137-44 (4th Cir. 2012) (quoting *Harrington* extensively and reversing district court's grant of writ based on his ineffective assistance of counsel claims).

In interpreting § 2254(d)(1) and discussing the federal courts' role in reviewing legal determinations made by state courts, the United States Supreme Court held as follows:

> [A] federal court may grant a writ of habeas corpus if the relevant state-court decision was either (1) "contrary to . . . [clearly] established Federal law as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States.

*Williams v. Taylor*, 529 U.S. 362, 404-05 (2000) (quoting from § 2254(d)(1)). "Clearly established Federal law in § 2254(d)(1) refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412). In considering whether a state-court decision is "contrary to" clearly established federal law, the federal court may not

14

grant relief unless the state court arrived at a conclusion opposite to that reached by the Supreme Court on a legal question, the state court decided the case differently than the Court has on facts that are materially indistinguishable, or if the state court "identifie[d] the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Williams*, 529 U.S. 362, 405-13. The "unreasonable application" portion of § 2254(d)(1) "requires the state court decision to be more than incorrect or erroneous[,]" it "must be objectively unreasonable," which is a higher threshold. *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (internal citation omitted).

Section 2254(e)(1) requires the federal court give a presumption of correctness to state-court factual determinations and provides that a petitioner can only rebut such a presumption by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Accordingly, a habeas petitioner is entitled to relief under § 2254(d)(2), only if he can prove, by clear and convincing evidence, that the state court unreasonably determined the facts in light of the evidence presented in state court.

b.   Ineffective Assistance of Counsel

The Sixth Amendment provides a criminal defendant the right to effective assistance of counsel in a criminal trial and first appeal of right. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court announced a two-part test for adjudicating ineffective assistance of counsel claims. First, a petitioner must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *Id.* at 687. Second, the petitioner must show that this deficiency prejudiced the defense. *Id.* at 694. The United States Supreme Court's 2011 decisions cited previously elaborate on the interplay between *Strickland* and § 2254, noting the standards are "both highly deferential," and "when the two apply in tandem,

15

review is doubly so." *Harrington*, 562 U.S. at 105 (internal quotation marks omitted); *Pinholster*, 131 S. Ct. at 1403.

Further, in *Pinholster*, the Court held for the first time that the federal court's habeas review under § 2254(d)(1) is limited to the record before the state court that adjudicated the claim on the merits. *Pinholster*, 131 S. Ct. at 1398. The Court explained that "review under § 2254(d)(1) focuses on what a state court knew and did." *Id.* at 1399. In the *Pinholster* case, the district court had conducted an evidentiary hearing and considered new evidence in connection with its review and granting of the petitioner's writ based on a finding of ineffective assistance of counsel. *Id.* at 1397. In an en banc decision, the Ninth Circuit Court of Appeals affirmed the district court's grant of the writ. *Id.* The United States Supreme Court granted certiorari and reversed the Ninth Circuit, finding that the district court should not have considered additional evidence that had not been available to the state courts. 131 S. Ct. at 1398. Because the federal habeas scheme "leaves primary responsibility with the state courts," and "requires that prisoners ordinarily must exhaust state remedies," the Court held that to permit new evidence to be presented in a federal habeas court "would be contrary to that purpose." 131 S. Ct. at 1399 (internal citation and quotation marks omitted).

When a petitioner raises in a § 2254 habeas petition an ineffective-assistance-of-counsel claim that was denied on the merits by a state court, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable[,]" not "whether defense counsel's performance fell below *Strickland's* standard." *Harrington*, 562 U.S. at 101. "For purposes of § 2254(d)(1), 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" *Id.* (citing *Williams*, 529 U.S. at 410) (emphasis in

original). "A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Id.*

### 2. Procedural Bar

Federal law establishes this court's jurisdiction over habeas corpus petitions. 28 U.S.C. § 2254. This statute permits relief when a person "is in custody in violation of the Constitution or laws or treaties of the United States[,]" and requires that a petitioner present his claim to the state's highest court with authority to decide the issue before the federal court will consider the claim. 28 U.S.C. § 2254(a)-(b). The separate but related theories of exhaustion and procedural bypass operate in a similar manner to require that a habeas petitioner first submit his claims for relief to the state courts. A habeas corpus petition filed in this court before the petitioner has appropriately exhausted available state-court remedies or has otherwise bypassed seeking relief in the state courts will be dismissed absent unusual circumstances detailed below.

### a. Exhaustion

Section 2254 contains the requirement of exhausting state-court remedies and provides as follows:

(b)     (1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court, shall not be granted unless it appears that—

(A)     the applicant has exhausted the remedies available in the courts of the State; or

(B)     (i) there is an absence of available State corrective process; or

(ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

(2) An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.

(3) A State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement.

(c)     An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

The statute requires that, before seeking habeas corpus relief, the petitioner first must exhaust his state court remedies. 28 U.S.C. § 2254(b)(1)(A). "To satisfy the exhaustion requirement, a habeas petitioner must present his claims to the state's highest court." *Matthews v. Evatt*, 105 F.3d 907, 911 (4th Cir. 1997) *overruled on other grounds by U.S. v. Barnette*, 644 F.3d 192 (4th Cir. 2011). Thus, a federal court may consider only those issues that have been properly presented to the highest state courts with jurisdiction to decide them.

In South Carolina, a person in custody has two primary means of attacking the validity of his conviction: (1) through a direct appeal; or (2) by filing an application for PCR. State law requires that all grounds be stated in the direct appeal or PCR application. Rule 203 SCACR; S.C. Code Ann. § 17-27-10, *et seq.*; S.C. Code Ann. § 17-27-90; *Blakeley v. Rabon*, 221 S.E.2d 767, 770 (S.C. 1976). If the PCR court fails to address a claim as is required by section 17-27-80 of the South Carolina Code, counsel for the applicant must make a motion to alter or amend the judgment pursuant to Rule 59(e), SCRCP. Failure to do so will result in the application of a procedural bar by the South Carolina Supreme Court. *Marlar v. State*, 653 S.E.2d 266, 267 (S.C. 2007). Strict time deadlines govern direct appeals and the filing of a PCR in the South Carolina courts. A PCR must be filed within one year of judgment, or if there is an appeal, within one year of the appellate court decision. S.C. Code Ann. § 17-27-45.

Furthermore, in filing a petition for habeas relief in the federal court, a petitioner may present only those issues that were presented to the South Carolina Supreme Court or the South

Carolina Court of Appeals. *See State v. McKennedy*, 559 S.E.2d 850, 853 (S.C. 2002) (holding "that in all appeals from criminal convictions or post-conviction relief matters, a litigant shall not be required to petition for rehearing and certiorari following an adverse decision of the Court of Appeals in order to be deemed to have exhausted all available state remedies respecting a claim of error") (quoting *In re Exhaustion of State Remedies in Criminal and Post-Conviction Relief*, 471 S.E.2d 454, 454 (S.C. 1990)).

b.    Procedural Bypass

Procedural bypass, sometimes referred to as procedural bar or procedural default, is the doctrine applied when a petitioner who seeks habeas corpus relief as to an issue failed to raise that issue at the appropriate time in state court and has no further means of bringing that issue before the state courts. In such a situation, the person has bypassed his state remedies and, as such, is procedurally barred from raising the issue in his federal habeas petition. Procedural bypass of a constitutional claim in earlier state proceedings forecloses consideration by the federal courts. *See Smith v. Murray*, 477 U.S. 527, 533 (1986). Bypass can occur at any level of the state proceedings if the state has procedural rules that bar its courts from considering claims not raised in a timely fashion.

The South Carolina Supreme Court will refuse to consider claims raised in a second appeal that could have been raised at an earlier time. Further, if a prisoner has failed to file a direct appeal or a PCR and the deadlines for filing have passed, he is barred from proceeding in state court. If the state courts have applied a procedural bar to a claim because of an earlier default in the state courts, the federal court honors that bar. As the United States Supreme Court explains:

> [state procedural rules promote] not only the accuracy and efficiency of judicial decisions, but also the finality of those decisions, by forcing the defendant to

19

litigate all of his claims together, as quickly after trial as the docket will allow, and while the attention of the appellate court is focused on his case.

*Reed v. Ross*, 468 U.S. 1, 10-11 (1984).

However, if a federal habeas petitioner can show both (1) "'cause' for noncompliance with the state rule[,]" and (2) "'actual prejudice resulting from the alleged constitutional violation[,]'" the federal court may consider the claim. *Smith v. Murray*, 477 U.S. at 533 (quoting *Wainwright v. Sykes*, 433 U.S. 72, 84 (1977)). When a petitioner has failed to comply with state procedural requirements and cannot make the required showing of cause and prejudice, the federal courts generally decline to hear the claim. *Murray v. Carrier*, 477 U.S. 478, 496 (1986).

If a federal habeas petitioner has failed to raise a claim in state court and is precluded by state rules from returning to state court to raise the issue, he has procedurally bypassed his opportunity for relief in the state courts and in federal court. A federal court is barred from considering the filed claim (absent a showing of cause and actual prejudice). In such an instance, the exhaustion requirement is technically met and the rules of procedural bar apply. *See Teague v. Lane*, 489 U.S. 288, 297-98 (1989); *Matthews*, 105 F.3d at 915 (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991); *George v. Angelone*, 100 F.3d 353, 363 (4th Cir. 1996)).

3.     Cause and Actual Prejudice

Because the requirement of exhaustion is not jurisdictional, this court may consider claims that have not been presented to the South Carolina Supreme Court in limited circumstances in which a petitioner shows sufficient cause for failure to raise the claim and actual prejudice resulting from the failure, *Coleman*, 501 U.S. at 750, or that a "fundamental miscarriage of justice" has occurred. *Murray v. Carrier*, 477 U.S. at 495–96. A petitioner may prove cause if he can demonstrate ineffective assistance of counsel relating to the default, show

an external factor that hindered compliance with the state procedural rule, or demonstrate the novelty of a particular claim. *Id.* Absent a showing of cause, the court is not required to consider actual prejudice. *Turner v. Jabe*, 58 F.3d 924, 931 (4th Cir. 1995). However, if a petitioner demonstrates sufficient cause, he must also show actual prejudice in order to excuse a default. *Murray v. Carrier*, 477 U.S. at 492. To show actual prejudice, the petitioner must demonstrate more than plain error.

### III.    Analysis

#### A. Procedurally-Barred Grounds

As an initial matter, Respondent maintains Grounds One and Four were procedurally defaulted in state court and are thus barred from federal habeas review. ECF No. 21 at 28. Specifically, Respondent argues that though both of these claims were raised to and ruled upon by the PCR court, neither claim was raised in the Petition for Writ of Certiorari to the South Carolina Supreme Court. *Id.* Therefore, Respondent argues that this court must find these claims barred from habeas review because the claims are procedurally defaulted. *Id.* at 28-29. In his response, Petitioner maintains that "Grounds One and Four are not procedurally defaulted, as is shown in pro se Petitioner's Special Notice of Exhaustion of Issues for good cause shown." ECF No. 37 at 2.[5] Furthermore, Petitioner argues that Grounds One and Four were ruled upon by the supreme court "when the court denied Petitioner's Motion for leave to file Motion under Rule 60(b) of the South Carolina Rules of Civil Procedure." *Id.* at 30.

In the Petition for Writ of Certiorari from Petitioner's first PCR, only Ground Three is raised. *See* ECF No. 21-12. Though Petitioner argues that Grounds One and Four "were raised in a very unique way," *see* ECF No. 33-1 at 2, the undersigned finds these issues were not

---

[5] Petitioner filed the "Special Notice of Exhaustion of Issues for Good Cause Shown" at ECF No. 33-1.

presented to the South Carolina Supreme Court in the Petition for Writ of Certiorari. However, these claims were raised to the Supreme Court's attention in the "Motion for Leave to File Motion under Rule 60(b) of the South Carolina Rules of Civil Procedure."[6] *See* ECF No. 33-2. In the Motion, Attorneys Carter and Gleissner represent that an Incident Report was not disclosed in the State's discovery responses. ECF No. 33-2 at 8. The police report indicates that an officer interviewed Rhoads and "spoke to the Solicitor's Office on [Rhoads'] behalf for a lighter sentence in exchange for subject's testimony." *Id.* Attorney Gleissner attached his own affidavit to the Motion, and there, he attests that he moved for and was granted leave to engage in discovery during PCR. ECF No. 33-2 at 16. Furthermore, Attorney Gleissner represents that he reviewed the discovery produced by the State, and the Incident Report was not disclosed. *See id.* Based on the apparent non-disclosure, Gleissner argues that either prosecutorial misconduct occurred or if trial counsel received the Incident Report he was ineffective for failing to use it during cross-examination of Rhoads or law enforcement. *Id.* at 16-17. The undersigned finds that Grounds One and Four should be reviewed on the merits.

Here, Petitioner presented these issues in his PCR Application, *see* App. 223-28, and later they were presented to the state's highest court via the request to file a Rule 60 Motion, ECF No. 21-14. However, to the extent the district court disagrees and finds this issue procedurally barred from habeas review, the undersigned finds the Supreme Court case of *Strickler v. Greene*, 527 U.S. 263 (1999), requires that the court excuse any procedural default. In *Strickler*, the Supreme Court held that a petitioner who had procedurally defaulted his *Brady* claim was excused from the procedural default. 527 U.S. at 289. Specifically, the Supreme Court held:

---

[6] Petitioner's Rule 60 Motion is not part of the Appendix presented to the court. Rather, Petitioner filed a copy of Rule 60 Motion in a request for an extension with the court. *See* ECF No. 33.

> petitioner has established cause for failing to raise a *Brady* claim prior to federal habeas because (a) the prosecution withheld exculpatory evidence; (b) petitioner reasonably relied on the prosecution's open file policy as fulfilling the prosecution's duty to disclose such evidence; and (c) the Commonwealth confirmed petitioner's reliance on the open file policy by asserting during state habeas proceedings that petitioner had already received "everything known to the government."

*Id.* There, the Court cited *Murray v. Carrier,* 477 U.S., at 488, and *Amadeo v. Zant,* 486 U.S. 214, (1988), as controlling precedents. Accordingly, the undersigned finds that to the extent Grounds One and Four are procedurally barred, Petitioner has established cause for failing to raise these claims in prior state actions. Therefore, the undersigned and will address all of Petitioner's Grounds on the merits.

    B. Merits

        1.    *Brady* Violation-State Conspiracy to Deprive Petitioner of Fair Trial

Respondent argues that Ground One is without merit because Petitioner has failed to show that a state court made an unreasonable determination of the facts in denying relief on this claim or that a state court unreasonably applied federal law in denying relief. ECF No. 21 at 32. The PCR court did not make a *Brady* analysis because when Petitioner had his PCR hearing, he was not in possession of the withheld *Brady* evidence. Therefore, this court must review the South Carolina Supreme Court's decision on Petitioner's Motion for Leave to file a Rule 60(b) Motion. Though impossible to tell from the court's brief denial order, the undersigned must assume that the supreme court reviewed the attachments to the Motion, conducted a *Brady* analysis at its level, and concluded Petitioner's claim was meritless. Withholding of evidence in a criminal trial violates several rules and possibly constitutes a *Brady* violation that could warrant the granting of a new criminal trial. Despite discovery requests served on Respondent seeking police investigatory materials and information regarding discussions with Petitioner's

co-defendant, the Incident Report was not produced. Petitioner obtained the Incident Report only after he filed a FOIA request. The State has not offered the court any explanation as to how the error occurred or why the incident report at issue was not disclosed to Petitioner sooner. Petitioner has been deprived of his right to fully present PCR arguments and has been deprived of his right to prepare his criminal defense. Nevertheless, these deprivations do not automatically warrant the granting of a new criminal trial.

Respondent asserts that "Petitioner failed to establish a factual predicate for a successful claim there was a *Brady* violation." ECF No. 21 at 35. In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or to punishment, irrespective of the good faith of the prosecution." 373 U.S. 83, 87 (1963). In *United States v. Agurs*, the Supreme Court extended *Brady* and held that duty to disclose is applicable even though there has been no request by the accused.  427 U.S. 97 (1976). A *Brady* violation has three essential elements: (1) the evidence must be favorable to the accused; (2) it must have been suppressed by the government, either willfully or inadvertently; and (3) the suppression must have been material, i.e., it must have prejudiced the defense at trial. *Monroe v. Angelone*, 323 F.3d 286, 299 (4th Cir. 2003). As the Supreme Court held in *Strickler*, to demonstrate a *Brady* violation a petitioner must "convince us that there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." 527 U.S. at 289.

In considering the first *Brady* prong, the undersigned finds the Incident Report was favorable to the accused in that it could have been used to impeach Jerome Rhoads and law enforcement officers. Therefore, the undersigned finds that Petitioner has satisfied the first *Brady* prong. Additionally, the undersigned finds this evidence was withheld by the State. Interestingly,

the State does not appear to take a position on this issue in this matter or in any prior matters. According to Petitioner's representation, he filed a FOIA request with the Saluda Sheriff's Office in order to obtain the Incident Report at issue. *See* ECF No. 21-21 at 5. Specifically, it appears that Brett Long, the acting police chief, sent Petitioner the items he requested pursuant to the FOIA request. *Id.* at 13. Moreover, Attorney Gleissner attests that during Petitioner's PCR matter, he moved for permission to engage in discovery, and his motion was granted. ECF No. 33-2 ¶ 5. Further, Attorney Gleissner represents that the "Incident Report was not included in the discovery responses" from the State during the PCR matter. *Id.* ¶ 9. Based on the representations from Petitioner and Attorney Gleissner, the undersigned finds, whether willfully or inadvertently, the State withheld the Incident Report from Petitioner during his criminal trial, thus satisfying the second prong of *Brady*. As noted above, at no point has the State come forward to explain how the error occurred or why the Incident Report at issue was not disclosed to Petitioner sooner.

The third *Brady* prong presents a more challenging analysis and requires a close examination of Petitioner's criminal trial transcript. Initially, the trial court conducted a *Neil v. Biggers*, 409 U.S. 188 (1972), hearing outside the presence of the jury. App. 29. There, law enforcement officers testified that they could positively identify Petitioner from video surveillance footage. *Id.* at 29-57. During the hearing, trial counsel moved to suppress the officers' testimony arguing:  "I think that is humanly impossible to identify [Petitioner]-he's talkin' about they want to put this evidence in because of the way he talked about his walk, his gait, his mannerisms, and I don't think that's permissible evidence under the rules of evidence, so I move to suppress his testimony concerning those things." App. 34. Ultimately, the trial court ruled with the State concerning admission of the officers' testimony and indicated that it was not

25

basing the decision on the credibility of the officers' testimony because that was a jury decision—that "this situation doesn't involve suggestiveness." App. 56-57.

The State's first witness was the owner of the local Cash Advance store ("Owner") where the armed robbery had occurred. App. 58. The Owner testified he was at his business when the robbery occurred—that he was in his office which is about 20 to 30 feet down the hall from the cash advance office. *Id.* at 59. Upon realizing there were armed robbers in the store, the Owner testified he called 911. *Id.* Furthermore, the Owner testified that the business is equipped with surveillance equipment with four different camera angles. *Id.* The Owner testified that two hours after the robbery they took the hard drive out of the surveillance system to preserve it. *Id.* at 60. The State then admitted the surveillance footage from the incident into evidence. *Id.* at 61. The Owner described that the videos showed that one of the robbers came inside the business at around 1:00 to "scop[e] the place out," [and] the robbery happened around 3:00. *Id.* The State played the portion of the video that depicts who the Owner believed was the person who may be connected with the robbery in a scene from 1:00, and the Owner pointed out the individual in a video clip. App. 63. After the 1:00 sequence on the video, the State played the portion of the video depicting the robbery, and the Owner identified an employee pressing the panic button during its commission. App. 64-65. The Owner testified that he did not see Petitioner commit the robbery. App. 66.

Next, the State called the Cash Advance regional manager ("Manager") to testify. App. 68. The Manager testified that he was working in the office on the day of the robbery and in describing the robbery sequence of the video explained:

> At the time I was on my cell phone at the desk, two people came in. One – the front one, of course, pulled the gun out, and the second person behind him with the white shirt came in. I stood up, asked him what do you want. That's when he told me, you know, where is the money turn around. . . . .

> He told me to turn around and get on the floor. I turned around. As I was gettin'
> on the floor he hit me in the back of head. And he kept yellin' where's the money
> where's the money. That's when the guy behind him in the white shirt was
> bouncin' around I kept tryin' to point to the desk in the cash drawer which is in
> front of the desk.

*Id.*  The Manager testified that approximately $1,300 was taken from the cash drawer during the

robbery. App. 70. The Manager testified that when the men approached him, the one with the

gun pulled up his mask, and:

> [The Manager] recognized that that is the person that came in earlier that day. No
> doubt in my mind. And then I could notice that the shirt he had on – the first time
> he came in, I noticed it was an odd shirt and had a lotta drawin'. When he came
> back for the second time, it was flipped inside out. I noticed the shirt, the gun and
> the man who he pulled his mask up.

App. 72. Specifically, the Manager testified that the mask went "[a]lmost to the top of [the

gunman's] hair." *Id.* After the Manager was struck over the head, he testified that he was lying

on the ground, and the other man taking part in the robbery was "in a white shirt jumpin around

lookin' for the money." App. 81. The Manager testified that he could not see the man's face who

was wearing the white shirt because he was wearing a hood over his face. App. 82. Additionally,

the Manager testified that he was focused on the man with the gun—not the man in the white

shirt, and the man wearing the white shirt never lifted his hood. App. 82-83.

The next witness, a Cash Advance employee ("Employee") testified that she witnessed

the first part of the robbery. App. 92-93. Specifically, the Employee testified that she heard a

loud commotion while in the Owner's office then took "a peek [to] see what was goin' on up

front. . . I barely opened the door, peeked out at about half an inch of a crack and saw a man with

a gun hit [Manager] in the back of the head as he was goin' to the floor and he was yellin'

wanting to know where the money was at." App. 93. The Employee testified that when she

reviewed the video surveillance tapes she "immediately" recognized Jerome Rhoads as one of

the robbers because he stole her car in 1995. App. 99-100. However, the Employee could not identify the other robber. App. 100.

Lt. James Turner, a police officer with the Saluda Police Department, testified as the State's next witness. App. 105. Lt. Turner testified that he was the first officer to arrive at the crime scene and was the investigating officer. *Id.* Based on the surveillance footage, Lt. Turner testified that he was able to identify Petitioner based on "the guy's mannerisms, the way he's moving and so forth, I recognized that from before [and] the way he carries himself, his gestures, the way he dressed." App. 106-07. Specifically, while watching the surveillance footage, Lt. Turner testified:  "In these frames he turns his head to the left and you can see the side of his face, and then I saw the side of his face, I recognized him to be [Petitioner]." App. 108. Additionally, Lt. Turner testified that he was able to recognize Petitioner because "I've seen him around town. I've had contact with him in the past." *Id.* Further, Lt. Turner testified that he had seen Petitioner walking the streets and running during a normal everyday routine and was familiar with Petitioner's manner of dress, stature, and build. App. 108-09.

Lt. Charles Holloway testified as the State's next witness. App. 111. Lt. Holloway was in Iraq when the robbery was committed but had since reviewed the surveillance footage of the robbery. *Id.* Lt. Holloway positively identified Petitioner and Jerome Rhoads from viewing the footage. App. 112. Lt. Holloway testified "Jerome Rhoads was the first man that entered the business and he was followed by [Petitioner]." *Id.* Further, Lt. Holloway testified that he had known Petitioner all his life, and in the time he had known Petitioner he became familiar with his walk, run, individual mannerisms, stature, and build. App. 112-13.[7]

---

[7] The undersigned notes that while testifying as witnesses neither Lt. Turner nor Lt. Holloway were questioned about an existing plea deal or plea negotiations with Jerome Rhoads.

Next, Jamie Mae Bonham, a neighbor of Petitioner, testified that she knew Petitioner, and she positively identified Petitioner at the beginning of her testimony. App. 116, 121. Further, Ms. Bonham testified that was aware of the robbery that occurred in Saluda on October 11, 2006, and earlier that day she "saw [Petitioner] and another young man they was tryin' on some ski caps I call it over their face. They pull 'em off, put 'em back in their pocket and I didn't see 'em no more after that." App. 117. Specifically, Ms. Bonham testified they tried on the masks while standing between two houses that are located across the street in front of her house. App. 117-18. Ms. Bonham testified that she has known Petitioner "[m]ost all his life." App. 118. After the robbery, Ms. Bonham testified that she went into the Cash Advance store on October 13 and told an employee there about seeing the two men putting on the masks. App. 118-19. She testified that Petitioner was wearing a blue outfit with a hood on it. App. 120. On cross-examination, Ms. Bonham testified that Petitioner tried on a green mask, and the man with him tried on a black or blue mask. App. 123.

Captain Robert Shorter, an officer with the Saluda County Sheriff's Office, testified that on October 13, 2006, he and Officer Long picked up Petitioner. App. 126-35. When he and Officer Long spotted Petitioner, Captain Shorter testified that Petitioner ran away from them. App. 130. After chasing Petitioner, officers eventually got him into custody. App. 132. Once in police custody, Captain Shorter arrested Petitioner. App. 133.

Next, Jerome Rhoads testified that he had been indicted on charges of armed robbery in connection with the break in and ABWIK, and conspiracy to commit armed robbery of the Cash Advance Store in October of 2006. App. 135. Rhoads testified that Petitioner committed the robbery with him on October 11 at the local Cash Advance Store. App. 137. Rhoads testified that before the robbery, they found skull caps and a gun. *Id.* Additionally, Rhoads said they tried on

the masks "on the path" at Petitioner's grandmother's house. App. 139. Rhoads testified that he

entered the Cash Advance Store earlier in the day prior to the robbery. App. 141. Next, Rhoads

reviewed the surveillance footage and identified himself as the individual who entered the store

first, with Petitioner following behind him. App. 143. Rhoads testified that he pointed the gun at

the Manager and then hit him with the gun, and Petitioner gathered the money. App. 144. Direct

examination ended with the following colloquy:

> Q:    When you were picked up, did you tell law enforcement you were
>       involved in this?
> A:    Yes, sir.
> Q:    Did you confess?
> A:    Yes, sir.
> Q:    Did they make a deal with you?
> A:    No, sir.
> Q:    You got any deal now?
> A:    No, sir.

App. 147.

On cross-examination, Rhoads testified that he told his sister that if he did not testify that

he was going to get 30 years. App. 148. Then, he seemed to clarify his answer and testified: "I

told my sister that with the charge of the crime that I did, I'm lookin' at 30 years." *Id.* Rhoads

confirmed during cross-examination that he had not been offered anything nor pled guilty, and

he did not know what sentence he was going to get. App. 156-57. Further, Rhoads testified that

he had not been promised anything. App. 157.[8]

After the State rested, Nicole Rhoads, Jerome Rhoads' sister, testified for the defense.

App. 167. She testified that she has a poor opinion about her brother's "honesty or veracity,

ability to tell the truth, [and] credibility." *Id.* Further, Ms. Rhoads testified that "[h]e's a big liar;"

---

[8] After the State presented its case, trial counsel moved for a directed verdict, and his motion was
denied. App. 162. The trial court found "[t]here is ample evidence to go to the jury on all causes
of action." *Id.*

and "[h]e tell lies. He manipulates you." App. 168. Additionally she testified that her brother told her that "if he didn't testify against [Petitioner], he'd get 30 years." *Id.*

Next, Tonya Kinard, Petitioner's girlfriend, testified that she was with Petitioner on October 11, 2006, from approximately 9:45 a.m. until around 4:00 p.m. App. 169-70. Ms. Kinard testified that she and Petitioner were in her bed when the robbery occurred, and he could not have been with Jerome Rhoads. App. 174. She also testified that her child comes home on the bus at 3:15 everyday, and her "baby could tell you he was there too." *Id.* Further, she testified that Petitioner was working the third shift at Amick's during the time frame of the robbery. App. 173. On cross-examination, Ms. Kinard testified that she never went to law enforcement to tell them Petitioner had an alibi and was with her when the robbery was committed. App. 177-79.

The State called Anissa Turner as a reply witness. App. 181. Ms. Turner, a human resource manager with Amick's Farms, testified that Petitioner was hired to work at Amick's. App. 182. Specifically, she testified that in October 2006, Petitioner was employed on October first and second, was terminated on October 3, 2006, and was not employed with Amick's on October 11, 2006. App. 183. Ms. Turner was the last witness to testify.

During closing arguments, Petitioner's trial counsel argued:

Jerome Rhoads obviously was there even though he hasn't been charged or he's been incarcerated, but you're not passing judgment on him 'cause you don't know what his situation is. His sister told you that if he testified against [Petitioner] they had promised him 30 years. They may or may not do—I don't know what—I mean I don't work for the state so I don't know. But I submit to you that [his] testimony is purchased at a price. In other words, he is buying his freedom. . . .

Jerome Rhoads, I submit to you, is a pathological liar. He will do anything to save himself. They have promised him whatever they gonna eventually give him and we don't know and you don't know, but I guarantee you it was purchased at a price of honesty, ladies and gentlemen.

31

App. 187-89. During the State's closing argument, Solicitor Young argued: "Jerome Rhoads is a thug. Pure and simple. The man – I don't have a problem with Mr. Ellisor calling him a career criminal. That's what he is . . . . Jerome Rhoads is gonna have to face his music." App. 194-95.

Having thoroughly reviewed the trial transcript, the undersigned finds that Petitioner has failed to satisfy the third *Brady* prong by convincing the court that "there is a reasonable probability that the result of the trial would have been different if the suppressed documents had been disclosed to the defense." *Stricker*, 527 U.S. at 289. Based on the surveillance footage and the witness testimony, particularly the testimony from Ms. Bonham, an uninterested witness and neighbor of Petitioner, the undersigned is not convinced that even if the Incident Report had been produced and used for impeachment purposes that there is a reasonable probability that the result of Petitioner's trial would be different. Additionally, Petitioner's trial counsel emphasized during closing arguments that Rhoads and the State were involved in plea negotiations, and Rhoads was "buying his freedom." Furthermore, the undersigned finds that although the Incident Report indicates Rhoads was willing to testify in exchange for leniency, and that Officer Turner spoke with the Solicitor's office on Rhoads' behalf seeking a lighter sentence in exchange for his testimony, the Incident Report does not provide detail regarding the nature of Rhoads' testimony or whether the Solicitor's office agreed to a deal. No evidence demonstrates that a plea deal was finalized with Rhoads by the time Petitioner was tried. Having concluded that a *Brady* violation did not occur, the undersigned finds that Ground One is without merit and should be dismissed.

### 2.    Perjured Prosecutor Testimony

In Ground Two, Respondent argues that Petitioner's claim that two solicitors gave perjured testimony during PCR is not a claim upon which federal habeas relief can be granted. ECF No. 21 at 35. Petitioner represents that "Ground Two states a constitutional claim of a

'continued' conspiracy from trial to deny Petitioner his right to due process. . . ." *Id.* ECF No. 37 at 2. An error during PCR proceedings is not a viable ground on which to grant habeas relief. *See e.g., Bryant v. Maryland,* 848 F.2d 492, 493 (4th Cir. 1988) (holding that errors and irregularities in connection with state PCR proceedings are not cognizable on federal habeas review); *Davis v. McCall*, No. 4:11-3263-MGL, 2013 WL 1282128, at *11 (D.S.C. Mar. 25, 2013) ("Such a [PCR court error] claim, regardless of the reason for which it is asserted, is not cognizable in a federal habeas action"); *Gray v. Stevenson*, No. 4:11-00227-CMC, 2012 WL 489010, at *16 (D.S.C. Jan. 24, 2012) *report and recommendation adopted,* No. 4:11-227-CMC-TER, 2012 WL 488906 (D.S.C. Feb. 15, 2012) *dismissed*, 474 F. App'x 130 (4th Cir. 2012) ("Alleged defects in state PCR proceedings are not cognizable in a federal habeas action."). Therefore, the undersigned recommends granting Respondent summary judgment concerning Ground Two, and dismissing this Ground.

### 3.     Ineffective Assistance of Counsel-Failure to Object to Officer Testimony

In Ground Three, Petitioner argues his trial counsel was ineffective for failing to object to officer's testimony identifying Petitioner by the way he walked and from a previous encounter. ECF No. 1 at 7. Petitioner describes the testimony as "prior 'bad acts'" that prejudiced him because it could be inferred that the officer's previous encounters were of a criminal nature, with Petitioner being the suspect. *Id.* Respondent maintains this claim is without merit because there was no testimony of prior bad acts of Petitioner. ECF No. 21 at 36-37. Furthermore, Respondent argues that "Petitioner's interpretation of the identification testimony in question is improper [because] Lt. Turner and Lt. Holloway did not expressly nor impliedly testify their familiarity with Petitioner resulted from his involvement in unlawful activity." *Id.* 37-38. Moreover,

Respondent submits that this testimony was admissible under the South Carolina Rules of Civil

Procedure. *Id.* at 38.

> On this issue, the PCR court determined:

> Applicant asserts that counsel was ineffective for failing to ask for a curative instruction after the officer's testimony alluded to prior bad acts of the Applicant. Applicant asserts that counsel failed to object to the officer's inference of prior bad acts of the Applicant. Specifically, Applicant directs this Court's attention to Lieutenant Turner's testimony, that "I've seen him around town. I've had contact with him in the past." (Tr. p.06, lines 14-16). This Court find and the record reflects that the officer's testimony does not contain a single reference to any prior bad acts by the Applicant. Additionally, the record reflects that the court cautioned the [**illegible**] about the officer's in-camera testimony about numerous dealings with the Applicant in the past. (Tr. p.101, lines 21-24). This Court finds that while counsel did not object to the officer's testimony based on testimony of prior bad acts, such an objection would likely have been overruled as there was no testimony of prior bad acts of the Applicant. This Court finds that Applicant failed to show counsel's performance was deficient and any resulting prejudice: therefore this allegation is denied and dismissed.

App. 302. As discussed in section III(B)(1) above, prior to trial, the court conducted a *Neil v.*

*Biggers* hearing. There, the court allowed officers to identify Petitioner in surveillance footage

during their testimony. During Petitioner's trial, Lt. Turner testified that he was able to recognize

Petitioner because "I've seen him around town. I've had contact with him in the past." *Id.*

Further, Lt. Turner testified that he had seen Petitioner walking the streets and running during a

normal everyday routine and was familiar with Petitioner's manner of dress, stature, and build.

App. 108-09. Lt. Holloway testified that he had known Petitioner all his life, and in the time he

had known Petitioner he became familiar with his walk, run, individual mannerisms, stature, and

build. App. 112-13.

> Upon review of the trial transcript, the undersigned finds neither of the law enforcement

officers' testimony contained evidence of Petitioner's prior bad acts. Therefore, the undersigned

finds the PCR court did not unreasonably apply the *Strickland* standard. Even if the officers'

testimony could be perceived as evidence of inadmissible prior bad acts, the undersigned finds that Petitioner has failed to demonstrate the prejudice prong of the *Strickland* test. Therefore, the undersigned finds that the PCR court's finding was supported by the record, and the decision was not contrary to, nor an unreasonable application of, clearly established federal law under § 2254(d)(1). Accordingly, the undersigned therefore recommends that Ground Three be dismissed.

### 4. Ineffective Assistance of Counsel-Failure to Discover Plea Deal

In Ground Four, Petitioner maintains his trial counsel was ineffective for failing to discover the leniency deal reached between the State and Jerome Rhoads and for failing to use the leniency deal to impeach Rhoads. ECF No. 1 at 8. Respondent maintains Ground Four is without merit because Petitioner has failed to show that a state court made an unreasonable determination of the facts in denying relief upon this claim. ECF No. 21 at 40. Further, Respondent argues that the PCR court's factual findings are supported by the record. *Id.* at 41. Additionally, Respondent represents that no witness testified that a firm plea deal between the State and Rhoads was in place during Petitioner's criminal trial. *Id.* Finally, Respondent argues that the PCR court reasonably applied *Strickland*. *Id.* at 42.

On this issue, the PCR court found:

> The record reflects that Mr. Rhoads testified at Applicant's trial that law enforcement did not make a deal with him and that Mr. Rhoads did not have any deal at that time. At the PCR hearing Mr. Rhoads testified consistent with his trial testimony that he did not have a deal with law enforcement or the solicitor's office in which he was to receive favorable treatment in exchange for his testimony against Applicant. Additionally, assistant solicitor Ervin Maye testified that he did not engage in any plea negotiations with Jerome Rhoads prior to or during Applicant's trial. Solicitor Maye testified that it is not unusual for a co-defendant, who testifies at trial, to later receive a lesser sentence. Solicitor Young testified that he did not make any offers or deals for Mr. Rhoads's testimony against Applicant with Mr. Rhoads prior to or during Applicant's trial. Solicitor Young testified that he has never in his tenure as a solicitor offered a deal to

> anyone prior [to] that person testifying at trial. This Court finds that Applicant has failed to present any evidence or offer any testimony supporting Applicant's allegation that the state had a deal in place with Mr. Rhoads for his testimony against Applicant prior to or during Applicant's trial. The Court finds that Applicant has failed to show that counsel's performance was deficient. Even, if this Court found counsel's performance deficient, Applicant cannot prove resulting prejudice as there is no evidence that Mr. Rhoads was given a deal by the state prior to or during Applicant's trial in exchange for his testimony. This Court finds that no deal between Mr. Rhoads and the state existed and that counsel cannot be held ineffective for failing to disclose and/or discover a deal that did not exist; therefore Applicant's allegations based on counsel's failure to discover a deal between the state and Mr. Rhoads are denied and dismissed.

App. 299-300. The Incident Report, prepared by Officer Turner on December 4, 2006, and obtained by Petitioner after his trial indicates that "[s]ubject [is] now willing to testify for leniency from the State. In reference to subject, I spoke to the Solicitor's Office on his behalf for a lighter sentence in exchange for subject's testimony." ECF No. 33-4 at 2. At best, this evidence demonstrates that Rhoads had preliminary discussions with Officer Turner regarding a lighter sentence should he testify. However, as all other evidence indicates, no firm plea agreement was set until after Petitioner's trial. Therefore, the undersigned finds that the PCR court did not unreasonably apply the facts to this issue.

Additionally, the PCR court determined that even if trial counsel's performance was deficient, Petitioner did not prove resulting prejudice "as there is no evidence that Mr. Rhoads was given a deal by the state prior to or during Applicant's trial in exchange for his testimony." App. 300. The undersigned finds there is still no evidence that a plea deal between Rhoads and the State had been secured until after Petitioner's trial. However, to the extent Petitioner is claiming that trial counsel was ineffective for failing to discover the Incident Report and use it for impeachment purposes, the undersigned finds that Petitioner was not prejudiced for the reasons discussed in section III(B)(1).

The undersigned finds that the PCR court's dismissal of Petitioner's claim of ineffective assistance of counsel was not an unreasonable application of federal law. Specifically, Petitioner failed to show that had the Incident Report been admitted into evidence for impeachment purposes, that there is a reasonable probability that the result of his trial would have been different. Accordingly, the undersigned finds that Petitioner has failed to demonstrate that the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *See* 28 U.S.C. § 2254(d) & (e)(1). As a result, the undersigned finds that Ground Four is without merit and should be dismissed.

IV.    Petitioner's Motion for Default Judgment

Petitioner filed a Motion for Default Judgment arguing Respondent had failed to file an answer or otherwise plead or appear within the time required by law. ECF No. 20. In Response, Respondent argued he timely filed a Return on March 30, 2015. ECF No. 31 at 1. Alternatively, Respondent argued that Petitioner would not be entitled to a Default Judgment based on the nature of this case. *Id.* at 2. The undersigned agrees.

After reviewing the filings, the undersigned finds that Respondent has not failed to timely respond or otherwise plead. Furthermore, courts have consistently held that an entry of default is not warranted in this context because:

> Were district courts to enter default judgments without reaching the merits of [habeas] claim, it would not be the defaulting party but the public at large that would be made to suffer, by bearing either the risk of releasing prisoners that in all likelihood were duly convicted, or the costly process of retrying them.

*Garland v. Warden*, No. 4:08-1668-JFA-TER, 2008 WL 4834597, at *2-3 (D.S.C. Nov. 4, 2008) (citing *United States v. Dill,* 555 F. Supp. 2d 514, 521 (citing *Bermudez v. Reid,* 733 F.2d 18, 21

(2d Cir. 1984)); *Worrell v. U.S. Parole Commission,* 2008 WL 4137680 (N.D.W.Va.).

Accordingly, it is recommended that Plaintiff's Motion for Default, ECF No. 20, be denied.

V.      Conclusion and Recommendation

Wherefore, based upon the foregoing, the undersigned recommends that Respondent's Motion for Summary Judgment, ECF No. 22, be GRANTED, Petitioner's Motion for Default Judgment, ECF No. 20, be DENIED, and the Petition be DENIED.


IT IS SO RECOMMENDED.


February 3, 2016                                    Kaymani D. West
Florence, South Carolina                           United States Magistrate Judge


**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**